UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IRWIN SEATING COMPANY,

            Plaintiff,

v.                                            Case No. 1:04-cv-568

                                              Hon. Wendell A. Miles

INTERNATIONAL BUSINESS MACHINES
CORPORATION, J.D. EDWARDS WORLD
SOLUTIONS COMPANY, VIEWLOCITY INC.,
f/k/a SYNQUEST, INC.,

            Defendants.

_____/

OPINION AND ORDER

This matter is before the court on Motions to Dismiss filed by Defendant International

Business Machines Corporation (Dkt. #14 ) and Defendant J.D. Edwards World Solutions

Company (Dkt. #19).  Plaintiff Irwin Seating Company filed a response in opposition to each of

the motions.  On August 24, 2004, Plaintiff filed its six count complaint alleging fraud and

fraudulent inducement (Count I );  negligent misrepresentation (Count II ); breach of implied

warranty of workmanlike services (Count III ); breach of warranty (Count IV); breach of contract

(Count V ); and deceptive trade practices in violation of Colorado law (Count VI).

For the reasons that follow, the court grants Edwards' motion as to Counts I, II, III, IV

and VI, and denies the motion as to Count V.  The court grants IBM's motion as to Counts I, II,

VI, and denies the motion as to Counts III, IV and V.

Background

Plaintiff Irwin Seating Company ("Irwin Seating") is a Michigan corporation that manufactures and sells stadium and theater seating. The seating is configured to the needs of its customers so that no orders are identical. Defendant International Business Machine Corporation ("IBM"), a New York corporation, provides consulting and information technology services. Defendant J.D. Edwards World Solution Company ("Edwards"), a Colorado corporation, develops and licenses computer software systems, including Enterprise Resource Planning ("ERP") software. Defendant Viewlocity Inc. ("Viewlocity"), a Georgia corporation, develops and licenses finite scheduling system computer software, including Manufacturing Manager ("MM").[1] Plaintiff alleges that the defendants were engaged in a joint venture referred to as "Big Tiger" or Supply Chain Advantage ("SCA"). Plaintiff and IBM entered into an agreement under which Plaintiff would receive a fully integrated Enterprise Resource Planning ("ERP") software system using IBM hardware, Edwards ERP software, and Viewlocity's MM software.

In June 1988, Plaintiff met with Viewlocity regarding the MM software, and after a demonstration of the software in operation at another furniture manufacturer, concluded that the MM software would meet its needs. Plaintiff approached IBM about assisting it in selecting a software/hardware system. There are no allegations that Viewlocity advised Plaintiff to seek IBM's assistance. Plaintiff informed IBM that it had three requirements for its system. The system must include scheduling software that would be fully integrated into the software system

---

[1] Viewlocity was formerly doing business as SynQuest, Inc. Plaintiff and Viewlocity have stipulated to dismissing all claims against Viewlocity.

supporting Plaintiff's other business functions.  The system must include "operational redundancy" to prevent stopping its operations if some of the software became inoperable. Finally, the system must accommodate the need for product configuration.  IBM recommended the Big Tiger project, which allegedly was described as a partnership between IBM, Edwards, and Viewlocity.  IBM represented that the system the partners would provide to Plaintiff, consisting of Edwards' One World software, Viewlocity's MM software, and IBM hardware would be a fully integrated, operable system.

During the following months, each of the Defendants allegedly had contacts with Plaintiff, orally and in writing, including conducting a two-day conference on May 25-26, 1999, at Plaintiff's facilities in Grand Rapids.  Allegedly, the Defendants repeatedly referred to themselves as partners, offering a "one stop total solution" with "single source accountability." In June 1999, Plaintiff entered into an agreement with IBM (Exhibit A to complaint), and executed licensing and maintenance agreements with Edwards for its One World software (titled Software License, Services and Maintenance Agreement, Exhibit B to Complaint), and with Viewlocity for its MM software (Exhibit C to complaint).

Plaintiff claims that the system it received was a total failure.  The MM software and One World software were never inter-operable, and software code that might have made the software inter-operable had not been written or tested.  Defendants failed to conduct an infrastructure assessment which caused them to significantly underestimate the cost of implementing the system.  After more than six months, IBM informed Plaintiff that it did not have the right hardware and software in place to provide the operational redundancy Plaintiff required.  In September, 2002, Edwards announced it was dissolving its partnership with Viewlocity and its

3

support for the Viewlocity software.  Plaintiff terminated the Big Tiger contract in the 4th quarter of 2002.

At some point, Edwards recommended that Plaintiff purchase and implement software described as a "product configurator," and known as Custom Works.  Edwards represented that Custom Works was fully inter-operable with OneWorld, and would meet Plaintiff's business needs.  On June 30, 1999, Plaintiff entered into a licensing and maintenance agreement with Edwards regarding Custom Works.  However, Custom Works failed to meet Plaintiff's requirements without significant custom modifications, which, in turn, "degraded the software's functionality and performance."   On January 4, 2000, Edwards advised Plaintiff that additional programing services were necessary.  This additional expenditure did not improve the situation. Plaintiff spent one and a half million dollars unsuccessfully attempting to make Custom Work operable.  On July 1, 2003, Plaintiff ended its contract for Custom Work.

Plaintiff seeks damages for the amount it spent under the Big Tiger contract; consequential damages arising from Defendants' fraud and breaches of contract; and warranty and punitive damages.

## Standard of Review

A motion under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims.  Barrett v. Harrington, 130 F. 3d 246, 251 (6th Cir. 1997).  The court must accept as true all factual allegations in the complaint and any ambiguities must be resolved in the plaintiff's favor.  Ziegler v. IBP Hog Market, 249 F. 3d 509, 511-512 (6th Cir. 2001).  The court need not accept as true legal conclusions or unwarranted factual inferences. Perry v. American Tobacco Co., 324 F.3d

845, 848 (6th Cir.2003).  Exhibits attached to the complaint are treated as part of the complaint

for all purposes, Fed.R.Civ.P. 10(c), and are also to be read in the light most favorable to the

plaintiff. Id.  A complaint should  be dismissed under Rule 12(b)(6) only if "it is clear that no

relief could be granted under any set of facts that could be proved consistent with the

allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed.2d 59

(1984).


<u>The IBM Customer Agreement</u>

Plaintiff alleges that it entered into the "Big Tiger" contract in June, 1999, (Complaint, p.

8, no. 24), and that a copy of the contract is attached to the complaint as Exhibit A. (Id.).  The

first page of exhibit A is a letter from IBM to Plaintiff, dated June 1, 1999, which begins "IBM is

pleased to present Irwin Seating with this proposal to assist with the implementation of the

JDEdwards (JDE) OneWorld application suite."  The final sentence of the letter states that "[t]his

offer will expire in 30 days from the date of this letter, unless extended by IBM."  The "proposal"

or "offer" consists of a document that includes an "executive overview" (section I), and a

"statement of work" (section II).  The parties refer to the statement of work as the "SOW."  The

SOW outlines the scope of the project, IBM's responsibilities, Plaintiff's responsibilities,

completion criteria, an estimated schedule, and estimated charges.

Appendix D to the SOW is titled "signature document," and is also dated June 1, 1999.

The heading of the signature documents reads:

CUSTOMER AGREEMENT

STATEMENT OF WORK FOR PROJECT SUPPORT SERVICES

5

CUSTOM SERVICES

The text of the signature document contains the following language: "Each of us agrees that the complete agreement between us about these services consists of 1) this SOW, and 2) the IBM Services Agreement (or any equivalent agreement signed by both of us)."  The signature document submitted to the court was not signed by Plaintiff or IBM.  Nonetheless, Plaintiff is claiming the SOW is the parties' agreement.  IBM has not denied that the parties entered into an agreement, nor has IBM denied that the SOW was one part of the parties' agreement.[2]

In support of its motion to dismiss, IBM submitted a document titled "IBM Customer Agreement." (IBM's Exhibit I).  The document is undated, and is not signed by Plaintiff or IBM. It is entirely different from the signature document, which is headed "CUSTOMER AGREEMENT."   IBM argues that the IBM Customer Agreement it submitted is referenced and integrated into the SOW agreement, and therefore governs the parties' relationship.  When ruling on a motion to dismiss under Rule 12(b)(6), the court is generally confined to reviewing the complaint to determine whether the plaintiff has stated a claim, and may not consider matters outside the pleadings. See e.g., Amini v. Oberlin Coll., 259 F. 3d 493, 502 (6th Cir. 2001). However, it may consider exhibits attached to a complaint or a motion to dismiss if the exhibits are specifically referenced in the complaint and are central to the plaintiff's claim. Nieman v. NLO, Inc., 108 F. 3d 1546, 1555 (6th Cir. 1997).  Plaintiff's complaint specifically references an agreement between Plaintiff and IBM, and the nature and extent of the agreement is central to

---

[2]  However, in its Memorandum of Law in support of its Motion to Dismiss, IBM states that the SOWs attached to Plaintiff's complaint are not the final versions. As to the terms addressed in the motion, "there is no material difference between these drafts and the final SOW."  IBM's Memorandum of Law, p. 8, n. 5.

Plaintiff's claims.  Nonetheless, the court must still determine whether it may consider this particular exhibit, the IBM Customer Agreement, when deciding IBM's Motion to Dismiss.

Where one writing references another instrument for additional contract terms, the two writings should be read together.  Forge v. Smith, 458 Mich. 198, 207, 580 N.W.2d 876, 881 (Mich.,1998).  However, "the incorporating instrument must clearly evidence an intent that the writing be made part of the contract." Id. at 207 n. 21.  The unsigned signature document appended to the SOW submitted by Plaintiff reveals an intent by IBM that the complete agreement between the parties would consist of the SOW and either (a)  "an IBM Services Agreement" or (b)  "any equivalent agreement signed by both [parties]."   IBM points to Schwarz Paper Company v. International Business Machines, No. 00 C 2417 (N.D. Ill Oct. 4, 2000), where under similar circumstances the court found that a Customer Agreement attached as an exhibit to IBM's motion to dismiss was incorporated by reference into the parties' SOW agreement.  In the Schwarz case, the signature document to the SOW that was presented by IBM to Schwarz Paper Company stated "[e]ach of us agrees that the complete agreement between us about these Services consists of 1) the Statement of Work and 2) the IBM Customer Agreement or IBM Agreement for Services, as applicable, (or any equivalent agreement signed by both of us)."   In the present case the SOW does not specifically reference an IBM Customer Agreement as it did in the Schwarz case.  Nonetheless, IBM is asking the court to find as a matter of law that the IBM Customer Agreement it has submitted as its Exhibit I is an agreement that is the equivalent of an IBM Services Agreement, and to then disregard the "signed by both of us" requirement.  There is no basis at this point in the proceeding upon which the court could determine whether or not the IBM Customer Agreement is equivalent to the IBM Service

Agreement.  In fact, the language of the <u>Schwarz</u> SOW that specifically refers to both documents supports an inference that they are two different documents, and that either one or the other is applicable to a given contract.

The court has considered the three "change authorizations" submitted by IBM, each of which was signed by the Plaintiff. (IBM's Exhibits 2, 3 and 4).  The authorization dated November 1999, states "[t]his Custom Services Project Change Authorization will be performed in accordance with the Terms and Conditions of the IBM Customer Agreement." (Exhibit 2). The other two authorizations state that,  "each of us agree that the complete agreement between us about these Services will consist of 1) This Change Authorization, 2) The Statement of Work and 3) the IBM Customer Agreement or any equivalent agreement signed by both of us." (Exhibits 3 and 4).  The language is far too ambiguous to conclude that Plaintiff knowingly and willingly agreed to incorporate the  "IBM Customer Agreement" submitted by IBM,  where it would not be unreasonable for Plaintiff to believe that the authorizations simply referenced the "CUSTOMER AGREEMENT" found on the signature document appended to the SOW.

In addition, the court has reviewed the cases which hold that a document may be incorporated even if one party has not seen or signed the document to be incorporated. <u>See</u> <u>e.g.</u>, <u>Ginsberg v. Myers</u>, 215 Mich 148, 150-151, 183 NW 749 (1921) (finding that where additional terms are made part of a written contract by reference, the parties are bound by those additional terms even if they have never seen them).  However, in the present situation the SOW, or the incorporating document, specifically calls for the "equivalent document" that is incorporated to be signed by both parties.

The court will not simply infer, without sufficient evidence, that the IBM Customer

Agreement is equivalent to the IBM Service Agreement, nor will it rewrite the SOW agreement to eliminate the "signed by both parties" language.   IBM, of course, is not precluded from again asserting in a motion for summary judgment that the IBM Customer Agreement is a part of the parties' agreement, and attaching competent evidence in support of the argument.


Choice of Law

Where jurisdiction is based on diversity, a federal court must apply the conflict of law rules of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 US 487, 490, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Wallace Hardware Co. v. Abrams, 223 F. 3d 382, 391 (6th Cir. 2000). Under Michigan law, the parties may choose for themselves which state's law will govern their contracts as long as the chosen state has some relationship to the parties and the transaction, and the law of the chosen state is not contrary to a fundamental policy of the forum state.  Johnson v. Ventra Group, Inc., 191 F. 3d 732, 738 (6th Cir. 1999); Krause v. Stroh Brewery Co., 240 F. Supp. 2d 613, 635 (E.D. Mich. 2002).  The agreement between Plaintiff and Edwards contains a choice-of-law provision which provides that Colorado law governs disputes "involving the subject matter of the Agreement." (Exhibit B to Complaint).  Plaintiff and Edwards agree that Colorado law governs Plaintiff's contract claims.

The SOW agreement between Plaintiff and IBM does not contain a choice of law provision.  When a contract does not contain such a provision, "Michigan courts apply the law of the forum state unless (1) there is no substantial relationship between the forum state and the contract, or (2) the application of the forum state's law would conflict with a policy prerogative of a state with a greater interest in the contract than the forum state."  NILAC Intern. Marketing

9

Group v. Ameritech Services, Inc., 362 F. 3d 354, 358 (6th Cir. 2004).   An agreement to provide services or goods  to a Michigan corporation at its Michigan facilities has a substantial relationship to Michigan, and there is no state that has a greater interest in the contract than the State of Michigan. The court will apply Michigan law to the Plaintiff's contract claims against IBM.

Edwards contends that Michigan law governs Plaintiff's tort claims, while Plaintiff argues that Colorado law applies.  Choice-of-law principles for contracts and torts are not necessarily the same.  Macurdy v. Sikov v. Love, P.A., 894 F. 2d 818 (6th Cir. 1990).  With regard to tort claims, Michigan presumes that the law of the forum state applies, unless there is a rational reason to apply another state's laws. Krause, 240 F. Supp. 2d at 635;  Sutherland v. Kennington Truck Serv., Ltd., 454 Mich. 274, 562 NW 2d 466, 471 (1997).  There is a rational reason to apply another state's law if that state's interest in having its law applied outweighs the forum state's interest in having its own law applied. Sutherland at 470-471; Krause at 635.

Plaintiff argues that under Watkins & Sons Pet Supplies v. IAMS Co., 254 F. 3d 607 (6th Cir. 2001), Colorado law must apply.  In Watkins, the Michigan plaintiff asserted a fraud claim, alleging that the Ohio defendant made promises of future performance that it did not intend to keep.  The Watkins plaintiff argued that Michigan law should apply to this fraud claim, although the parties contract provided that Ohio law governed the contract.  The court concluded that the distinction between a claim that defendant made promises it did not intend to keep and a claim of breach of contract was so slight that, under the parties' contract, Ohio law should apply.  Id. at 611.  The court discussed and distinguished the facts before it from Imaging Financial Services v. Lettergraphics/Detroit, Inc., 1999 WL 115473 (6th Cir. 1999) and Allmand Assocs. v. Hercules,

10

Inc., 960 F. Supp. 1216 (E.D. Mich. 1997).  In Imaging Financial Services, the court held "that under Michigan law, fraud is a tort claim, and that when an injury occurs in Michigan to a Michigan company, Michigan law would govern the claim despite a choice of law clause." Watkins at 611, citing Imaging Financial Services at *8-9.  The  Allmand plaintiff brought claims for fraud and misrepresentation, alleging that the defendant had made false misrepresentations that induce the plaintiff to enter into the contract. The court applied Michigan law because the effects of the tort were felt in Michigan, noting that the parties agreed that Michigan law should apply. Allmand, at 1223, n. 3.

    Plaintiff's allegations and claims are more similar to those in Imaging Financial Services and Allmand.  Plaintiff is a Michigan resident. The alleged tortious conduct occurred in Michigan, and the injury was felt in Michigan.  Accordingly, the court finds that Michigan's interest in this dispute outweighs any interest Colorado may have in the matter.  See, e.g., Sprague v. Toll Bros., 265 F. Supp. 2d 792, 795, n. 2 (E.D. Mich 2003) (finding Michigan law applied where Plaintiff was a Michigan resident and the tortious conduct occurred in Michigan); Krause v. Stroh Brewery Co., 240 F. Supp. 2d  613 (finding Michigan law applied where injury occurred in Michigan although Plaintiff was a Florida resident); Roskam Baking Co. v. Lanham Machinery Co., 71 F. Supp. 2d 736, 744, n.1 (W.D. Mich. 1999) (applying Michigan law to tort claim despite choice of law provision providing for Georgia law to apply to contract, where Plaintiff was from Michigan and tortious conduct took place in Michigan).  The court will apply Michigan law to Plaintiff's tort claims against Edwards.  For the same reasons, Michigan law applies to Plaintiff's tort claims against IBM.

<u>Discussion</u>

A.  <u>Joint Venture</u>

Plaintiff claims that the Defendants were engaged in a joint venture.  IBM and Edwards argue that there was no joint venture, and therefore, they cannot be held jointly liable for the acts of other defendants.  A joint venture requires (a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking; (c) a single project for profit; (d) a sharing of profits as well as losses; (e) contribution of skills or property by the parties; and (f) community of interest and control over the subject matter of the enterprise.  <u>John Harris & Associates, Inc. v. Day</u>, 916 F.Supp. 651 (E.D.Mich.1996) (citing <u>Berger v. Mead</u>, 127 Mich. App. 209, 214-15, 338 N.W.2d 919 (1983)).   Plaintiff has not pleaded all of the elements of a joint venture.  While initial presentations were made by the three defendants together, Plaintiff entered into separate contracts with each defendant, and pursuant to the contracts, paid each defendant directly.  Approximately two and a half years before Plaintiff terminated the Big Tiger project, it negotiated directly with Edwards for the CW system, and paid Edwards the licensing and implementation fee. There are no allegations or evidence that the Defendants shared profits or losses.  Nor are there allegations showing a community of interest and control over the subject matter.  The letter accompanying the IBM proposal states, "IBM is pleased to present Irwin Seating with this proposal to assist with the implementation of the JDEdwards (JDE) OneWorld applications suite."  There is no language in IBM's proposal or the contracts with  Edwards and Viewlocity that would support a reasonable inference that any one of the companies had control over the operations of either of the other companies.   While the allegations support some affiliation between the defendants, all of the requirements for finding a joint venture have not

been satisfied.

Plaintiff, however, argues that the doctrine of partnership by estoppel applies. In order for a partnership by estoppel to exist, (1) the defendant must have represented himself as a partner or consented to another person's representation that he is a partner of one with whom he is not partners, and (2) the person to whom the false representation is made must have detrimentally relied on that representation. <u>American Casualty Co. v. Costello</u>, 174 Mich. App. 1, 9, 435 NW 2d 760 (1989). The representation may be oral or written or by conduct. MICH. COMP. LAWS 449.16(1). When a partnership liability results, the party making the representation is liable as though he were an actual member of the partnership. If no partnership liability results, the party is jointly liable with the other persons who have consented to the representation. MICH. COMP. LAWS 449.16(1)(a) and (b). Plaintiff has repeatedly alleged in its complaint that all of the defendants represented they were a partners in the "Big Tiger" project, and that Plaintiff relied on the representation when entering into the contracts with defendants. Because the court must assume that all of the factual allegations in the complaint are true when deciding a motion to dismiss, Plaintiff has stated sufficient facts which, if proven, would establish a partnership by estoppel.


B. <u>Statute of limitations</u>

Edwards contends that all of Plaintiff's claims are barred by the parties' contractual limitation period of one year. Plaintiff argues that the parties' licensing contract is governed by the Colorado UCC which provides for a three year statute of limitation that may not be altered by contract. Plaintiff is correct.

13

Under Colorado law, parties to a contract may agree that an action on the contract be commenced in a shorter period of time than prescribed by the applicable statute of limitations. Hepp v. United Airlines, 36 Colo. App. 350, 353, 540 P. 2d 1141 (Colo. App. 1975). However, the contract between Edwards and Plaintiff was a licensing agreement for computer software. Courts have generally held or recognized by implication that Article 2 of the Uniform Commercial Code ("UCC") applies to contracts involving computer software licenses, even though the agreement may include obligations to provide other services such as installation, training and maintenance. Micro Data Base Systems v. Dharma Systems, 148 F. 3d 649, 654 (7th Cir. 1998) (applying Indiana law); Advent Systems Ltd. v. Unisys Corp., 925 F. 2d 670, 675 (3d Cir. 1991); RRX Indus. v. Lab-Con, Inc., 772 F. 2d 543 (9th Cir. 1985) (applying California law); Dahlmann v. Sulcus Hospitality Technologies, Corp., 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999) (finding that sale of hotel reservation system which included hardware, software, training, installation and support service was transaction in goods within the meaning of Michigan's UCC); Rocky Mountain Microsystems, Inc. v. Public Safety Sys., Inc., 989 F. Supp. 1352, 1356 (D. Colo. 1998).

The applicable statute in Colorado provides that an action for breach of any contract for sale must be commenced within the time period prescribed in section 13-80-101. Section 4-2-725(1). Section 13-80-101(1)(a) provides that any civil action under the UCC must be commenced within three years of the date the claim accrues. The period of limitation set forth in the statute "may not be varied by agreement of the parties." Section 4-2-725(2); Rocky Mt. Microsystems v. Public Safety Sys., Inc., 989 F.Supp. 1352, 1356 (D. Colo.,1998). Accordingly, Plaintiff had three years to bring this action from the date the claims accrued.

14

Referring to its relationship with Edwards, Plaintiff alleged that the implementation of Edwards' software "became so complex, so fraught with errors and so far over budget," that, on June 17, 2002, it attempted to cancel its maintenance agreement with Edwards. (Complaint, ¶ 51). Plaintiff filed its claims in an action for arbitration on August 15, 2003, which is within three years of the time its claims against Edwards appear to have accrued.

Michigan law provides for a six-year statute of limitations on contract claims, MICH. COMP. LAWS § 600.5807(8), and a six year statute of limitations for fraud or misrepresentation. MICH. COMP. LAWS § 600.5813; Blue Cross and Blue Shield v. Folkema, 174 Mich. App. 476, 436 NW 2d 670 (1988). Because there is no language in the SOW prescribing a period of limitations, Plaintiff's claims against IBM are not barred by the statutes of limitations.


C.   Breach of Implied and Express Warranties (Counts III and IV)

Under Colorado law, warranties of merchantability and fitness arise in every contract for sale unless properly excluded. Lease Finance, Inc. v. Burger, 40 Colo. App. 107, 575 P.2d 857 (1977); Colo. Rev. Stat. § 4-2-316. The agreement between Plaintiff and Edwards contains the following language:

> EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT,
> THERE ARE NO WARRANTIES, EXPRESSED OR IMPLIED,
> INCLUDING BUT LIMITED TO, THE IMPLIED WARRANTIES
> OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR
> PURPOSE.  J.D. EDWARDS MAKES NO WARRANTY, EXPRESS
> OR IMPLIED, REGARDING ACCESSORY SOFTWARE OR ANY

MODIFIED PORTIONS OF THE SOFTWARE.

J.D. EDWARDS MAKES NO WARRANTY AS TO THE ADEQUACY

OR CAPACITY OF ANY HARDWARE OR THIRD PARTY

SOFTWARE TO ATTAIN SOME OR ALL OF THE PERFORMANCE

OBJECTIVES OF CUSTOMER.  MANY FACTORS, INCLUDING

BUT NOT LIMITED TO THE TYPE OF NETWORK, THE AMOUNT

OF TOTAL NETWORK TRAFFIC, AND THE TYPE AND PATTERN

OF USAGE OF THE LICENCED PRODUCTS OR OTHER SOFTWARE

ON THE NETWORK WILL IMPACT THE PERFORMANCE OF THE

LICENCED PRODUCT INSTALLED ON SUCH NETWORK . . . .

(Exhibit B to Complaint, Article V (4)(b) and (c)).  The implied warranty of merchantability may

be disclaimed by a conspicuous writing that actually mentions merchantability. The implied

warranty of fitness may be disclaimed by conspicuous, disclaiming language, although the

warranty need not be specifically mentioned.  Colo. Rev. Stat. § 4-2-316(2).  A disclaimer is

conspicuous if it is written so that a reasonable person against whom it is to operate ought to

have noticed it.  Colo. Rev. Stat. § 4-1-201(10);  Richard O'Brien Companies v. Challenge-Cook

Bros., Inc., 672 F. Supp. 466, 469 - 470 (D.Colo. 1987).   When the contract is between a

commercial buyer and a commercial seller, the seller is not obligated to draw the buyers attention

to the clause. Id.

Plaintiff cites Olson Mfg. v. Roberts, 131 Colo. 152, 280 P. 2d 433 (Colo. 1955) in

support of its argument that a party cannot disclaim the known true nature of a product.   In

Olson, several buyers sued the manufacturer and dealer of beet harvesting machines. The court

16

did not apply, or mention, the currently relevant statute in its discussion, and moreover, the disclaimer relied upon by the manufacturer in its defense appeared in the contract between the manufacturer and the dealer.  Because the disclaimer was not known to the plaintiff buyers before their purchases were made, the disclaimer was not binding.  Id. at 438.  Here, the provision in Plaintiff's agreement with Edwards, on page four of a six page agreement,  is the only provision written entirely in upper case letters, which makes it very conspicuous, and there is a specific reference to merchantability.  The clause meets the requirements of the statute, and, therefore, Plaintiff is precluded from suing on breach of implied warranties.

The court in Kensair Corp. v. Peltier, 28 Colo. App. 290, 472 P. 2d 700 (Colo. App. 1970), noted that there is a distinction between a false representation and a warranty.  A false representation "is an antecedent statement made as an inducement to enter into a contract while a 'warranty' is part of the contract of sale."  Id. at 291.  Nonetheless, in Boyd v. A.O. Smith Harvestore Products, 776 P. 2d 1125 (Colo. App. 1989), the court assumed "arguendo" that pre-sale representations made by the seller were express warranties, but found that the disclaimer and integration clause in the parties' contract precluded recovery on such warranties.  Id. at 1130.

In the parties' fully integrated contract, Edwards specifically made no warranty as to the "adequacy or capacity of any hardware or third party software to attain some or all of the performance objectives of customer."  This disclaimer of any prior statements to the contrary was conspicuous, and by virtue of the integration clause, agreed to by Plaintiff.  Thus, Plaintiff is precluded from suing Edwards on a theory of violation of express warranties.

There are no warranties or disclaimers in the SOW, which outlines the four phases of the project.  The Foundation Phase includes "discovery work sessions for client specific

17

information."  Work to configure the client's Edwards software begins in the Configuration

phase, and includes building a prototype, and loading and validating the preconfigured templates.

The Solution Phase consists of disconnecting, shipping and reinstalling the client configured

software and hardware at the client's site. Finally, the Implementation Phase is where the system

configuration is completed; reports, interfaces, conversions and enhancements are written and

tested; training is conducted, and the system is turned over to the "production environment."

(Exhibit A to the Complaint, p. 6).

The Uniform Commercial Code applies to the sale of goods.  MICH. COMP. LAWS §

440.2102.  Goods are defined as all things that are movable at the time of identification to the

contract. MICH. COMP. LAWS § 440.2105(1).  The code sections regarding warranties of

merchantability and fitness for a particular purpose do not apply to contracts for services.

DeValerio v. Vic Tanny Intern. 140 Mich. App. 176, 180, 363 N.W.2d 447 (Mich. App.,1984).

Although the component parts of the computer system are "goods" as defined in the Code, the

service element appears to predominate.  Where a contract is for both goods and services, the test

is whether the predominant factor is the rendition of service with goods incidentally involved, or

is a transaction of sale with labor incidentally involved.  Houghton v. Alfa-Laval, Inc., 184 Mich.

App. 731, 734, 459 N.W.2d 42  (Mich. App.,1990).   At this point in the proceeding, the court

cannot conclude that Plaintiff will be unable to prove that its agreement with IBM is for a

transaction in goods and subject to the Uniform Commercial Code.


D.  Deceptive trade practices in violation of Colorado law (Count VI)

Plaintiff claims that Edwards, willfully, knowingly, and intentionally employed deceptive

acts and practices constituting "bad faith conduct" in violation of the Colorado Consumer

Protection Act ("CCPA").  Colo. Rev. Stat. § 6-1-101 et seq.  Defendant contends that its alleged

wrong is a private matter that does not "significantly impact the public" as required under the

CCPA.

The CCPA is a remedial statute intended to deter and punish deceptive trade practices

committed against the public.  Showpiece Homes Corp. v. Assurance Co., 38 P. 3d 47 (Colo.

2001).  Its purpose is to provide "consumers who are in a position of relative bargaining

weakness with protection against a range of deceptive trade practices." Curragh Queensland Min.

Ltd. v. Dresser Industries, 55 P. 3d 235, 240-241 (Colo. App. 2002), citing Martinez v. Lewis,

969 F. 2d 213, 222 (Colo. 1998).  To establish a deceptive trade practice, the plaintiff must show

that a defendant "knowingly made a false representation," which "induces a party's action or

inaction." Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc., 62 P. 3d 142, 147

(Colo. 2003).  Under the CCPA, damages are available to "any person" injured by a defined

deceptive trade practice. See Colo.Rev.Stat. § 6-1-113(1).  Although the term "any person" is

broad, the CCPA will not remedy private injuries.  Rocky Mountain Rhino Lining, Inc. v. Rhino

Linings USA, Inc., 37 P.3d 458, 463 (Colo.Ct.App.2001) (citation omitted).  In order for an

alleged deceptive trade practice to be actionable, it must significantly impact the public as actual

or potential consumers, and not merely involve a private wrong involving a contractual

relationship.  Rhino Linings. at 148-149.

When determining whether a practice significantly impacts the general public, the

Colorado courts consider the number of consumers directly affected by the practice; the relative

sophistication and bargaining power of the consumers affected by the challenged practice; and,

evidence that the challenged practice has previously affected other customers or has the significant potential to do so in the future.  Martinez, 969 P. 2d at 222;  Coors v. Security Life of Denver Ins. Co., 91 P. 3d 393, 399 (Colo. App. 2003).  In Hall v. Walter, 969 F. 2d 224 (Colo. 1998), the defendant, a real estate developer, marketed residential lots under the false pretense that lot owners would have a right-of-way across land owned by the plaintiff.  The court found that "because the misrepresentations were directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers," the representation significantly impacted the public as consumers. Id. at 235.  In Loughridge v. Goodyear Tire and Rubber Co.,192 F. Supp. 2d 1175 (D.Colo.,2002), the defendant manufactured a hose for radiant heating systems.  The systems circulated warm fluid under indoor flooring as an alternative to conventional heating systems, or under driveways and sidewalks to melt snow and ice.  During a four year period, the defendant sold 25 million linear feet of the hose, and Colorado was the primary market.  Defendant's marketing efforts and its website were targeted at the ultimate consumer. The defendant "branded" the hose to imply certain characteristics that it allegedly knew were untrue.  The court found that a large number of consumers in Colorado were directly affected by the challenged practices, and the majority of the consumers were individual homeowners or installers with relatively little sophistication and bargaining power.  Id. at 1181.

In contrast, the plaintiff in Martinez, 969 F. 2d 213, brought suit against a doctor hired by an insurance company to perform independent medical evaluations.  The doctor's conclusion that plaintiff was malingering caused the insurance company to deny plaintiff's medical claim.  The plaintiff contended that the doctor falsely represented to the insurance company that he was

qualified to diagnose organic brain injury. The court found that the doctor's misrepresentation did not significantly impact the public as consumers, noting that the deception was committed against only one person, and the insurance company that had allegedly been deceived was a large, sophisticated organization rather than a vulnerable individual consumer. Id. at 222.

The plaintiff in Rhino Lining, 62 P. 3d 142, was a distributor bringing suit against its supplier and a third-party distributor. The court held that the plaintiff could not maintain an action under the CCPA because (1) the alleged fraud affected only three of 550 distributors, and not the general public; (2) the plaintiff was represented by counsel during contact negotiations and was knowledgeable about the industry; (3) the alleged misrepresentations were limited to potential distributors rather than the general public; and, (4) the alleged misrepresentations made to the plaintiff were distinguishable from the advertisements addressed to the general public. Id. at 150. Likewise, the court in Coors v. Security Life of Denver Ins. Co., 91 P. 3d 393 (Colo. App. 2003), found that overcharging on insurance premiums to 200 of 20,000 policyholders did not amount to a significant public impact where it affected only 1% of the policyholders and plaintiff was a sophisticated businessman who had been represented by counsel during the sales process for the policy. Id. at 399. A final case offering guidance is Dresser Industries, 55 P. 3d 235 (Colo. App. 2002), where the defendant sold the plaintiff a large machine used in the reclamation of coal. The machine had significant mechanical defects which the seller unsuccessfully attempted to fix during the next seven years. The court held that the transaction did not affect the public as actual or potential consumers, id at 241, and found it significant to its determination that although the defendant advertised its product to about 3000 mining companies, only a very few could afford the $38 million machine. In addition, the plaintiff was

neither "economically vulnerable nor unsophisticated in matters pertaining to mining equipment," and, represented by counsel, negotiated at length with defendant for the terms of the purchase agreement and several subsequent modifications. Id.

The fully integrated computer system allegedly promised to Plaintiff was not advertised to the general public as were the residential lots in Hall or the radiant heat hose in Loughridge. Considering the complexity of the system, and its contract cost of more than a million dollars, the purchasers, or potential purchasers, of a similar system would clearly not be individual homeowners or small business entities with relatively little sophistication and bargaining power. Assuming the CCPA applies to this case, Plaintiff has not alleged facts demonstrating that the defendants' alleged fraudulent conduct significantly impacted the general public.  Accordingly, the court will grant Defendant Edward's motion on this claim.

Even assuming Plaintiff could bring a claim against IBM under the CCPA, it must be dismissed for the reasons discussed in relation to the claim against Defendant Edwards.


E.  Fraud and Fraudulent Inducement, and Negligent Misrepresentaion - Counts I and II

Defendants contend that Plaintiff's tort claims are barred by the economic loss doctrine and the contracts' respective integration clauses.

The economic loss doctrine provides that where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is in contract alone. The doctrine precludes a plaintiff from bringing an action in tort where damages arise out of the commercial sale of goods and the losses incurred are purely economic.  Bailey Farms, Inc. v. NOR-AM Chemical Co., 27 F.3d 188, 192 (6th Cir.1994) (finding economic loss doctrine

applies where damages "were purely economic and consequential, and there was no accident or physical injury.");  Neibarger v. Universal Cooperatives, 439 Mich. 512, 528, 486 N.W. 2d 612 (1992); Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 368, 532 N.W. 2d 541 (1995).  Because Plaintiff's damages resulted from alleged defects in Defendants' products, the economic loss doctrine is applicable.

However, there is one exception to the doctrine. A plaintiff may bring claims of both breach of contract and fraud in the inducement.  In Huron Tool, 209 Mich. App. 365, the court explained the exception:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

Id. at 372-373.  In Huron Tool, the plaintiff sued a consulting service for breach of contract, fraud, and misrepresentation alleging that the defendant supplied defective software. The defendant was to provide plaintiff with "system's design, programming, training and installation services."  After plaintiff paid the full purchase price, defendants performed additional work customizing the software for plaintiff's use, and billed for each modification. The court found the economic loss doctrine was applicable as the alleged fraudulent representations pertained to the quality and characteristics of the software system sold by the defendant and were "indistinguishable from the terms of the contract and warranty that plaintiff allege[d] were breach."  Id..  Similarly, in Allmand Associates, Inc. v. Hercules Inc. 960 F.Supp. 1216, 1228

23

(E.D.Mich.,1997), the court held that the economic loss doctrine applied to plaintiff's fraud claim which was supported by allegations that defendant falsely represented that its product was compatible with zinc alloy tooling but which ultimately ruined plaintiff's tools. The allegations, as the court explained, were not extraneous to the contractual dispute. See also, Merchants Publishing Co. v. Maruka Mach. Corp. of America, 800 F.Supp. 1490, 1493 (W.D.Mich.1992) (holding that actions for fraud, negligent misrepresentation and rescission of contract arising from the sale of a faulty printing press could not be maintained under Michigan law because the claims derived their existence out of the parties' contract.).

Plaintiff alleges that the defendants falsely represented that (1) Edwards and Viewlocity's software had previously been successfully integrated; (2) plaintiff would receive a fully integrated, end-to-end supply chain solution with a rapid return of investment; (3) Edwards' software was a fully functional, technically superior, mature and stable product with a proven record of on-time, on-budget performance; (4) a fully functional system, consisting of Edwards and Viewlocity software, would be implemented in six to nine months at a cost of 3.7 million dollars. Because these alleged falsehoods pertain to the quality, functionality and character of Edwards software, the exception to the economic loss doctrine will not save Plaintiff's tort claims against Edwards.  Because IBM's alleged falsehoods also concern the quality, functionality and character of the product it agreed to deliver to Plaintiff, the economic loss doctrine applies as well to Plaintiff's tort claims against IBM.

In addition, the contract between Edwards and Plaintiff contained the following integration clause:

> This Agreement, including its terms and conditions and its Attachments

> and Addenda, is a complete and exclusive statement of the agreement
> between the parties, which supercedes all prior or concurrent proposals
> and understandings, whether oral or written, and all other communications
> between the parties relating to the subject matter of this Agreement.

Where, as here, a contract contains an explicit integration clause, it conclusively establishes that

the parties intended the written contract to be a complete expression of their agreement."

Wonderland Shopping Cnt. Venture Ltd. v. CDC Mortgage Capital, Inc., 274 F. 3d 1085, 1095

(6th Cir. 2001) (applying Michigan law).  The integration clause nullifies all antecedent

agreements and parol evidence is not admissible.  UAW-GM Human Resource Center v. KSL

Recreation Corp., 228 Mich.App. 486, 499, 579 N.W.2d 411, 417 (1998); and see MICH. COMP.

LAWS 440.2202.  There is an exception.  Parol evidence is admissible to prove fraud in the

inducement, but only where the alleged fraud would invalidate the merger clause itself or where

the fraud would invalidate the entire contract, including the merger clause.  Id. at 503, 579

N.W.2d at 419.  Fraud that relates solely to an oral agreement that was nullified by a valid merger

clause has no effect on the validity of the contract.  UAW-GM Human Resource Center, 228

Mich. App. at 502-503.  When a contract contains a valid merger clause, the only fraud that can

invalidate the contract is where "one party induces the other to suppose that the antecedent

agreement is included in the writing, or to forget that agreement and execute an incomplete

writing, while describing it as complete." Id. at 503.  Moreover, Michigan courts have generally

held that if statements are made to induce a plaintiff to enter a written contract, an integration

clause or merger clause may render unreasonable the plaintiff's reliance on oral representations.

See Novak v Nationwide Mutual Insurance Co, 235 Mich. App 675, 689-691; 599 NW2d 546

(1999); UAW-GM Human Resource Center, 228 Mich. App at 504.

In UAW-GM Resource Center, the union entered into a contract with a hotel that was to be the site of a union convention because the hotel assured the union that its employees were unionized.  The union cancelled its contract with the hotel upon learning that the hotel's new owner had replaced unionized staff with non-union workers.  The court held that the merger clause would nullify any such agreement not included in the contract, and the merger clause made it unreasonable for the union agent to rely on any representations not included in the contract.  The court explained that the union's injury resulted from its agent's failure to include the requirement in the contract rather than from reliance on any misrepresentations by the hotel. Id.  Here, Plaintiff's contract with Edwards is a fully integrated "Software License, Service and Maintenance Agreement," which does not include any references to IBM, Viewlocity, or the "Big Tiger" project.  Plaintiff does not allege that it was defrauded regarding the integration clause or that Edwards induced it to believe the licensing agreement contained terms that it did not. Accordingly, the integration clause is a second reason why Plaintiff may not present parol evidence to expand its contract with Edwards.


F.  Breach of Contract - Count V

Edwards and IBM both argue that the limitation period in their respective contracts bars all of Plaintiff's claims, including the breach of contract claim. However, as previously discussed in part B, the IBM contract before the court does not contain a clause limiting the time a suit must be brought, and under Colorado law, the period of limitation may not be altered by the contract between Plaintiff and Edwards.  Because Plaintiff has pleaded facts which, if proven,

26

could establish its breach of contract claims against Edwards and IBM, the court will not dismiss Count V.

G. Damages

Plaintiff seeks damages for the amount it spent under the Big Tiger contract, and consequential and punitive damages. IBM contends that Plaintiff's prayer for consequential and punitive damages is barred by a clause in the Customer Agreement, which, as discussed, is not before the court. The SOW contains no such clause.

Edwards points to a limitation of liability clause in its contract with Plaintiff which limits the total amount of damages to the amount paid to Edwards, and disclaims all consequential, special, punitive, or incidental damages. Edwards states that Plaintiff paid $2,495, 545.10. The Colorado courts will enforce a clause limiting damages unless the clause is unconscionable. 1745 Wazee LLC v. Castle Builders Inc., 89 P.3d 422, 426 (Colo. App.,2003); Cooley v. Big Horn Harvestore Systems, 813 P. 2d 736, 743 (Colo., 1991); University Hills Beauty Academy, Inc. v. Mountain States Tel. & Tel. Co. 38 Colo. App. 194, 197, 554 P.2d 723 (Colo. App. 1976). There are several factors the courts must consider when determining whether a clause is unconscionable, including the relationship of the parties; the factors of assent, unfair surprise and notice; and all the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect. Davis v. M.L.G. Corp., 712 P. 2d 985, 991 (Colo., 1986). The court in Wenner Petroleum Corp. v. Mitsui & Co., Inc., 748 P. 2d 356 (Colo. App. 1987), pointed out that " '[o]nly after all of the circumstances surrounding the negotiation and performance of the contract have been determined at trial can the enforceability of the

consequential damages limitation be determined . . . .' " Id. at 358, quoting Milgard Tempering, Inc. v. Selas Corp., 761 F. 2d 553 (9th Cir. 1985).  The Plaintiff has made allegations that, if proven, may support a conclusion that the limiting clause is unconscionable.  Accordingly, at this juncture the court will not strike Plaintiff's request for damages in excess of the amount it paid to Edwards.

Conclusion

For the reasons discussed above, the court GRANTS Defendant Edward's Motion to Dismiss Counts I, II, III, IV and VI, and DENIES the motion as to Count V; further, the court grants Defendant IBM's Motion to Dismiss Counts I, II, VI, and Denies the motion as to Counts III, IV and V.

So ordered this 22nd day of June, 2005.

 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge