UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IRWIN SEATING COMPANY,

                Plaintiff,                      FILE NO. 1:04-CV-568

v.                                     HON. ROBERT HOLMES BELL

INTERNATIONAL BUSINESS
MACHINES CORP., et al,

                Defendants.
_____/

## OPINION

      This is an action filed by Plaintiff Irwin Seating Company ("Irwin" or "Irwin Seating"), a Michigan manufacturer of stadium and theater seating, against Defendants International Business Machine Corporation ("IBM") and J.D. Edwards World Solutions Company ("Edwards"), a company that develops and licenses computer software. Plaintiff also originally sued Viewlocity Inc., the successor to SynQuest, a company that develops and licenses finite scheduling software systems, including the Manufacturing Manager ("MM") software. Plaintiff alleges that IBM, Edwards and SynQuest joined forces to market to Irwin a single-source computer system through a project called "Big Tiger."

      Plaintiff originally raised six counts in its complaint: (1) fraud and fraudulent inducement in representing the degree of integration of the Big Tiger system; (2) negligent misrepresentation; (3) breach of implied warranty of workmanlike services; (4) breach of

warranty; (5) breach of contract; and (6) deceptive trade practices in violation of Colorado law. On motions to dismiss filed by IBM and Edwards, the Court dismissed Counts I through IV and VI of the complaint against Edwards and Counts I, II, and VI of the complaint against IBM. Plaintiff and Viewlocity stipulated to the dismissal of all claims against Viewlocity. The matter presently is before the Court on seven motions for summary judgment filed by Defendants International Business Machines Corp. ("IBM") and J.D. Edwards World Solutions Company ("Edwards") (Docket ##230, 231, 232, 234, 235, 236, 237). For the reasons that follow, Defendants are granted summary judgment.

## I.

The following facts are taken in the light most favorable to Plaintiff.

Plaintiff alleges that Defendants were engaged in a joint venture referred to as Big Tiger. According to the complaint, Plaintiff entered into agreements with Defendants under which Plaintiff would receive a fully integrated Enterprise Resource Planning ("ERP") software system using IBM hardware, Edwards ERP software, and SynQuest MM software. An ERP system is designed to integrate all components of a company's business, from purchasing to manufacturing, sales and finance. The system has software components that will carry out each of the necessary functions and permit integrative communications between the various departments. (Compl. ¶¶ 9-10.)

In 1998, Irwin began to investigate acquiring a new computer system because the program they were then using was not going to be supported any longer and because their

2

business needs had grown.  (Edwards Ex. 2; Compl. ¶ 13, Finewever dep. at 17.)  In June 1998, Plaintiff met with SynQuest regarding the MM software, and, after a demonstration of the software in operation at another furniture manufacturer, concluded that the MM software would meet its needs.  Plaintiff approached IBM about assisting it in selecting a software/hardware system.  Plaintiff informed IBM that it had three requirements for its system: (1) the system must include scheduling software that would be fully integrated into the software system  supporting Plaintiff's other business functions; (2) the system would include "operational redundancy" to prevent stopping operations if software became inoperable; and (3) the system would accommodate the need for product configuration.  In early 1999, IBM recommended the Big Tiger project, which allegedly was described as a partnership between IBM, Edwards, and SynQuest.  IBM allegedly represented that the partners would provide a system consisting of Edwards' One World software, SynQuest's MM software, and IBM hardware that would be a fully integrated, operable system.  (Compl. ¶ 20.)

The evidence demonstrates that Defendants made multiple contacts with Plaintiff, including conducting a two-day conference on May 25-26, 1999, at Plaintiff's facilities in Grand Rapids.  The testimony indicates that Defendants referred to themselves as partners offering a "one stop total solution" with "single source accountability."  In June 1999, Plaintiff entered into Statement of Work ("SOW") with IBM (Compl. Ex. A; IBM Ex. 3), and executed licensing and maintenance agreements with Edwards for its One World software

(Compl. Ex. B; Edwards Ex. 14) and with SynQuest for its MM software (Compl. Ex. C; Edwards Ex. 15).

The original SOW with IBM was signed on June 23, 1999, for work connected to the implementation of Irwin's system using Edwards' OneWorld software.  The SOW signature page contained the following declaration: "Each of us agrees that the complete agreement between us about these services consists of 1) this SOW,  and 2) the IBM Services Agreement (or any equivalent agreement signed by both of us)."  (IBM Ex. 3.)  On October 28, 1999, IBM and Irwin completed the first project change authorization ("PCA #1") for implementation of the SynQuest system.  (IBM Ex. 6.)  The PCA #1 expressly stated that "[t]his Custom Services Project Change Authorization will be performed in accordance with the Terms and Conditions of the IBM Customer Agreement."  *Id.*  On March 31, 2000, the parties agreed to PCA #2 and PCA #3.  (IBM Ex. 7, 8.)  On August 15, 2000, they signed PCA #4.  (IBM Ex. 9.)  All three of those subsequent PCAs contained identical language immediately before the signature:

> Each of us agree that the complete agreement between us about these Services will consist of 1) This Change Authorization, 2) The Statement of Work and 3) The IBM Customer Agreement or any equivalent agreement signed by both of us.

(IBM Ex. 7, 8, 9.)

Plaintiff claims the system it received was a total failure.  The MM software and One World software were never inter-operable and software codes that might have made them so had not yet been written or tested.  On January 4, 2001, Irwin signed a letter agreement that

4

was sent by IBM on December 21, 2000, which declared their mutual intent to close their existing contract. (IBM Ex. 37.) Under that agreement, IBM agreed to provide another contract for 280 hours at $230 per hour, free remote telephone support during the first quarter of 2001, and the existing documentation for upgrading J.D.Edwards V7.3.3.1 to V7.3.3.2. *Id.* IBM billed only 89.5 hours under this second contract. (Burgan Decl. ¶6, IBM Ex. 48.) After January 2002, IBM performed no work on the project. (Burgan Decl. ¶6, IBM Ex. 48.) On May 29, 2002, Bernie Stephen, Director of Information Services for Irwin, acknowledged by e-mail to John Burgan of IBM that any future work from IBM would require a new contract. (IBM Ex. 49.)

The Software License, Services and Maintenance Agreement ("SLSMA" or "Agreement") Irwin signed with Edwards on June 30, 1999 was expressly governed by Colorado law. (Edwards Ex. 14, Agreement Art. V, § 13(D).) The Edwards Agreement also contained a number of express warranties, together with disclaimers of all implied warranties. The Agreement expressly disclaimed responsibility "for problems in [the software] caused by alterations or modifications made by [Irwin Seating] or a third party, arising out of the malfunction of [Irwin Seating's] equipment, or caused by other software products not licensed by J.D. Edwards." (Edwards Ex. 14, Agreement Art. V, § 3(A)(iii).) Edwards also disclaimed liability for the "adequacy or capacity of any hardware or third party software to attain some or all of the performance objectives of customer." (Edwards Ex. 14, Agreement Art. V, § 4(C).) The Agreement further expressly declares,

5

> Customer understands that J.D. Edwards' business partners are independent entities and, except to the extent they are acting as subcontractors pursuant to Article III, Section 3(C) of this Agreement, J.D. Edwards is not liable nor bound by any acts of such business partners.

(Edwards Ex. 14, Agreement Art. V, § 13(G).)   Immediately above the signature line in bold print, the Agreement declared as follows:

> This Agreement, including its terms and conditions and its Attachments and Addenda, is a complete and exclusive statement of the agreement between the parties, which supersedes all prior or concurrent proposals and understandings, whether oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

(Edwards Ex. 14, Agreement Art. V, Integration Clause.)

In addition, the Attachment to the Agreement governing CustomWorks, also dated June 30, 1999, states that "CustomWorks is a stand-alone suite and is not currently provided in a form that is interoperable with the J.D. Edwards WorksSoftware or OneWorld Software."   Because the CustomWorks software was not interoperable with OneWorld, Irwin, on December 20, 1999, signed a "Beta Test Amendment" to the original Agreement, under which it licensed a beta version of CustomWorks that contained a complete disclaimer of warranty, declaring:

> THE BETA SOFTWARE PROVIDED IN THIS BETA TEST IS NOT A FULLY TESTED PRODUCT OFFERING, AND HAS NOT BEEN COMPLETED ACCORDING TO J.D. EDWARDS' NORMAL DEVELOPMENT PROCEDURES.  CUSTOMER'S USE OF THE BETA SOFTWARE IS AT CUSTOMER'S SOLE RISK; THE BETA SOFTWARE MAY CONTAIN DEFECTS, FAIL TO COMPLY WITH APPLICABLE SPECIFICATIONS, AND PRODUCE UNINTENDED OR ERRONEOUS RESULTS WHEN OPERATED IN COMBINATION WITH OTHER J.D. EDWARDS PRODUCTS.   CUSTOMER ACCEPTS THE BETA

6

SOFTWARE "AS IS."  J.D. EDWARDS DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED . . . .

(Edwards Ex. 14; Amendment § 6.)   With respect to consulting services, J.D. Edwards warranted that "the Services supplied under Article III shall be performed in a professional and workmanlike manner."  (Edwards Ex. 14, Agreement Art. V, § 3(B)(i).)

CustomWorks allegedly failed to meet Plaintiff's requirements without significant custom modifications, which, in turn, "degraded the software's functionality and performance."  On January 4, 2000, Edwards advised Plaintiff that additional programming services were necessary.  This additional expenditure did not resolve the situation.  Plaintiff spent $1.5 million unsuccessfully attempting to make CustomWorks operable.  On July 1, 2003, Plaintiff ended its contract for CustomWorks.

In September, 2002, Edwards announced it was dissolving its partnership with SynQuest and its support for SynQuest software.  Plaintiff terminated the Big Tiger contract in the fourth quarter of 2002.

Plaintiff seeks damages for the amount it spent under the Big Tiger contract, consequential damages arising from Defendants' breaches of contract and fraud, and warranty and punitive damages.

## II.

On a motion for summary judgment, a court must consider all pleadings, depositions, affidavits and admissions and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

7

(1986).  The court, however, "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 533 (6th Cir. 2002) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). The party moving for summary judgment has the burden of pointing the court to the absence of evidence in support of some essential element of the opponent's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of a genuine issue for trial.  *Id.*  Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P.  56(c); *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).

In order to prove that a triable issue exists, the nonmoving party must do more than rely upon allegations, but must come forward with specific facts in support of his or her claim.  *Celotex*, 477 U.S. at 322; *Mulhall v. Ashcroft*, 287 F.3d 543, 550 (6th Cir. 2002).  A party opposing a motion for summary judgment "may not merely recite the incantation, 'credibility,' and have a trial in the hope that a jury may believe factually uncontested proof." *Fogery v. MGM Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004).  After reviewing the whole record, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "'[D]iscredited testimony is not [normally] considered a sufficient basis'" for defeating the motion.  *Anderson*, 477 U.S. at 256-57 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)).  In addition, where the factual context makes a party's claim implausible, that party must come forward with more persuasive evidence demonstrating a genuine issue for trial.  *Celotex*, 477 U.S. at 323-24; *Matsushita*, 475 U.S. at 586-87; *Street*, 886 F.2d at 1480.  "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).

## III.

### A.    IBM Motions

After disposition of the motions to dismiss, the claims remaining against IBM are limited to breach of implied warranty, breach of warranty and breach of contract.  IBM makes four motions for summary judgment.  (Docket ## 234, 235, 236, 237.)  In light of the Court's determination on two of IBM's motions, however, the Court need not and does not decide Defendant IBM's remaining motions.

1.    IBM Customer Agreement

In its first motion for summary judgment (Docket #234), IBM contends that the contract between IBM and Irwing Seating is governed not only by the Statement of Work ("SOW") signed by the parties with respect to the particular project in issue, but also by the IBM Customer Agreement ("ICA"), which purports to govern all work between IBM and its customers.

It is undisputed that Irwin Seating and IBM have had a long relationship involving numerous contracts since the 1980s.  In 1991, IBM began using the ICA as the master agreement with all of its customers.  (IBM Ex. 18, Willis Decl. ¶ 3; IBM Ex. 19, Notice to IBM Customers at 2.)  The ICA contains the standard commercial terms between IBM and its customers, and the specifics of transactions were governed by the ICA, together with any applicable attachments, and the particular SOW that contained the relevant transactional terms. The ICA was sent to each of IBM's customers in 1991, and, according to IBM internal records, Irwin was sent the ICA at that time.  (IBM Ex. 18, Willis Decl. ¶ 4.)  Irwin presents significant evidence, however, that Irwin never possessed a copy of the ICA.  (Irwin Ex. 2, Stephen dep. 2/13/06 at 127-29; Irwin Ex. 72, Shorey dep. at 60-61; Irwin Ex. 12, Weakley dep. 2/10/06 at 128-29; Irwin Ex. 1, Fynewever dep. at 105-06.)  For purposes of this motion, the Court will assume Irwin's evidence is credible.

As previously discussed in the recitation of facts, Appendix D to the SOW is a signature page, which was signed by the parties on June 23, 1999.  The text of that page

10

includes the following language: "Each of us agrees that the complete agreement between us about these services consists of 1) the SOW, and 2) the IBM Services Agreement (or any equivalent agreement signed by both of us)."  (IBM Ex. 3 at App. D.)

IBM has submitted an unsigned copy of the IBM Customer Agreement ("ICA")  (IBM Ex. 2.)  Notwithstanding the fact that the ICA submitted by IBM is unsigned, IBM contends that the ICA is an "equivalent agreement" under the terms of the signature page of the SOW.

Some evidence exists in the SOW itself that the parties understood that the ICA applied to the SOW.  The cover letter to the SOW, which was attached by Plaintiff as its own exhibit to the Complaint, states that "[t]he IBM activities described in the enclosed Statement of Work will be performed in accordance with the terms of the IBM Customer Agreement." (Compl. Ex. A at 1, IBM Ex. 3, App. D.)  The SOW references the ICA in Appendix C, concerning contract deliverables.  (IBM Ex. 3 at 34.)

The IBM Services Agreement and ICA are identical in many material respects. (Compare IBM Ex. 2 with IBM Ex. 5.)  Indeed, the principal commercial terms governing virtually all aspects of the relationship between the parties parallel one another: the fact that both are Master Agreements (IBM Ex. 2, § 1.2; IBM Ex. 5 at 1, Service Description); the payment terms and procedures (IBM Ex. 2, § 1.5; IBM Ex. 5 at 1, Charges and Payments); a disclaimer of liability for the actions of IBM business partners (IBM Ex. 2, § 1.14; IBM Ex. 5 at 1, IBM Business Partners); a two-year contractual period of limitations (IBM Ex. 2, § 1.11((6); IBM Ex. 5 at 1, General ¶ 7); a description of express warranties (IBM Ex. 2, § 2.1;

IBM Ex. 5 at 2, Warranty for IBM Services); a disclaimer of all other express or implied warranties (IBM Ex. 2, § 2.2; IBM Ex. 5 at 2, Warranty for IBM Services); a limitation of liability to the greater of $100,000 or the amount charged for the service in issue (IBM Ex. 2, § 1.10; IBM Ex. 5 at 2, Limitation of Liability); and a choice of New York law (IBM Ex. 2, § 1.18; IBM Ex. 5 at 2, Geographic Scope and Governing Law).  Although Irwin argues that the agreements are not identical because the ICA is significantly longer, a review of the documents demonstrates that, aside of typeface and formatting differences and the fact that the ICA contains terms governing both machines and services while the Service Agreement governs only services, the agreements contain no material differences in the content of the terms.

Further, the course of the parties' business dealings over the subsequent years demonstrates that the ICA was the master agreement relied upon by the parties to govern their transactions.  Irwin Seating executed eight other SOWs with IBM during the course of the project that incorporate the terms of the ICA.  (IBM Exs. 10-17.)  Indeed, several of those same documents refer to the IBM Customer Agreement and the IBM Agreement for Services as equivalent documents.  (IBM Ex. 10 ("Each of us agrees that the complete agreement between us about these services consists of 1) this Statement of Work and 2) the IBM Customer Agreement or IBM Agreement for Services, as applicable, or any equivalent agreement signed by both parties."); IBM Ex. 13 (same); IBM Ex. 16 ("The following are incorporated in the terms and conditions of the *IBM Customer Agreement* between Irwin

12

Seating Company and IBM and shall apply, unless specifically amended herein, to the scope of work and the services to be provided under this Statement of Work for Professional Services (SOW).  In case or conflict between the terms and conditions contained in the *Agreement for Services* and this SOW, the forms of this SOW shall take precedence." (emphasis added)).

The Court therefore concludes that, based on a comparison of the terms and the interchangeable language used in other agreements between the parties, no genuine issue of material fact exists that the two agreements are "equivalent agreements" within the meaning of the SOW.  The applicability of the ICA, therefore, depends on whether it was signed by the parties.

In May 1996, Irwin Seating executed a contract entitled "IBM Customer Agreement Signature Page for Attachments."   (IBM Ex. 1.)  That document, which identified certain attachments to the IBM Customer Agreement for "Support Family Services," contains the following language:

> By signing below for our respective Enterprises, each of us agrees to the terms of the IBM Customer Agreement and the included Attachments.

*Id.*  The person executing the June 1996 document, Sharon Shorey, as Irwin's head of information technology, undisputedly had authority to sign the contract on behalf of Irwin. (IBM Ex. 21, Weakley dep. at 132; IBM Ex. 22, Shorey dep. at 21-22, 28.)  In June 1997, in a "Customer Agreement Supplement for IBM Support Family Services", Shorey again agreed on behalf of Irwin that "[t]he terms of the IBM Customer Agreement (or any equivalent

13

agreement signed by both of us) and the applicable Attachments apply to this transaction."

(IBM Ex. 23.)  On this supplement to the ICA, the ICA to which the parties agreed was

identified by a specific number: "IBM Customer Agreement number: HQ12291."  *Id.*

According to the uncontested declaration of Douglas Willis, the ICA agreement number sent

by IBM to its customers in 1991 was identified by the number HQ12291, which

corresponded to the date the ICA was mailed to customers, January 22, 1991.  (IBM Ex. 18,

Willis decl. ¶¶ 4-5.)

The ICA, by its terms, is a master agreement that governs the relationship between

IBM and Irwin, and it applies to all subsequent transactions between the parties:

> This IBM Customer Agreement (called the "Agreement") covers the major
> business transactions we may do with you, including:
>
> > *(a)* sale of Machines;
> > *(b)* license of Programs; and
> > *(c)* provision of Services.
>
> We also make several Options available to you concerning the Products and
> Services we provide under this Agreement, such as volume discounts.
>
> This Agreement and its applicable Attachments and Transaction Documents
> are the complete agreement regarding these transactions, and replace any prior
> oral or written communications between us.
>
> By signing below for our respective Enterprises, each of us agrees to the terms
> of this Agreement.  Once signed, 1) any reproduction of this Agreement, an
> Attachment or Transaction Document made by reliable means (for example,
> photocopy or facsimile) is considered an original and 2) all Products and
> Services you order under this Agreement are subject to it.

(IBM Ex. 2 at 1.)  The applicability of the ICA to all future transactions also is discussed in

14

Section 1.2 of the ICA, governing "Agreement Structure":

**Attachments**

Some Products and Services have terms in addition to those we specify in this Agreement.  We provide the additional terms in documents called "attachments" which are also part of this Agreement.  For example, we described the additional terms for IBM Information Network Services in an Attachment.  We make the Attachments available to you for signature.

**Transaction Documents**

For each order you place, we will provide to you the appropriate "Transaction Documents" that confirm the specific details of your order.  The following are examples of Transaction Documents, with examples of the information they may contain:

1.  supplements (Machine quantity and type ordered, price, estimated shipment date, and warranty period);
2.  exhibits (eligible Products by category, discount schedules, and available contract periods);
3.  addenda (selected contract-period duration, start date, and total quantity or revenue committed);
4.  statements of work (project schedule, responsibilities, and charges); and
5.  invoices (item, quantity, price, amount due, and other typical invoice information.

**Conflicting terms**

If there is a conflict among the terms in the various documents, those of an Attachment prevail over those of this Agreement.  The terms of a Transaction Document prevail over those of both of these documents.

**Our Acceptance of Your Order**

A Product or Service becomes subject to this Agreement when we accept your order.  We accept your order by doing any of the following:

1.  sending you a Transaction Document;
2.  shipping the Product; or

15

3.      providing the Service.

**Your Acceptance of Additional Terms**

You accept the additional terms in an Attachment or Transaction Document by doing any of the following:

1.      signing the Attachment or Transaction Document;
2.      using the Product of Service, or allowing others to do so; or
3.      making any payment for the Product or Service.

(IBM Ex. 2, § 1.2.)

Because Shorey agreed on behalf of Irwin to the terms of the ICA, and because the ICA, by its own terms, is applicable to subsequent transactions between the parties, IBM contends that no genuine issue of material fact exists that the parties' agreement included the ICA. In response, Irwin argues that the applicability of the ICA is a question of fact because the testimony of various Irwin witnesses demonstrates that Irwin did not have a copy of the ICA in its files and that none of the testifying representatives recalled ever seeing the ICA. (Irwin Ex. 2, Stephen dep. at 127-28; Irwin Ex. 11, Boes dep. at 166-67; Irwin Ex. 1, Fyneweaver dep. at 105-06; Irwin Ex. 101, Irwin dep. at 77-78; Irwin Ex. 20, Tanis dep. at 48-50; Irwin Ex. 12, Weakley dep. at 125-26.) Further, Irwin contends that the 1996 IBM Customer Agreement Signature Page for Attachments cannot be deemed a signature page for the ICA itself because it is applicable to a transaction unrelated to the 1999 SOW.

The Court concludes that the 1996 IBM Customer Agreement Signature Page for Attachments constitutes a signature page for the ICA. By its terms, the IBM Customer Agreement Signature Page for Attachments declares that by signing, "each of us agrees to

16

the terms of the IBM Customer Agreement and the included Attachments." The signature page is not limited to the attachments, but includes express agreement to the terms of the ICA itself.

Moreover, the mere fact that Irwin cannot find or never received the ICA is legally irrelevant. When a written agreement refers to a separate document for additional contract terms, the court must read the writings together. *Forge v. Smith*, 580 N.W.2d 876, 881 (Mich. 1998); *Wonderland Shopping Ctr. Venture Ltd. Partnership v. CDC Mortgage Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir. 2001) (applying Michigan law). By signing the document, Irwin, a sophisticated company, agreed to be bound by the terms of the document. It was incumbent upon Irwin to be familiar with the terms of the document to which it was agreeing. The failure to read a document that one agrees to be bound by does not excuse a party from the terms of the agreement. *See Ginsberg v. Myers*, 183 N.W. 749, 750 (Mich. 1921) (holding that where additional terms are made part of a written contract by reference, the parties are bound by those terms even if they have never seen them); *see also Morgan v. Goddard*, 214 N.W. 155, 156 (Mich. 1927); *Industrial Power Products v. Ford Motor Co.*, No. 257021, 2005 WL 3190712, at *2 (Mich. Ct. App. Nov. 29, 2005).

Irwin argues that Sixth Circuit law requires that "[f]or the terms of another document to be incorporated by reference into the document executed by the parties, the reference must be clear and unequivocal." *Rinard v. Eastern Co.*, 978 F.2d 265, 269 n.3 (6th Cir. 1992); *see also NILAC Int'l Mktg. Group v. Ameritech Serv., Inc.*, 362 F.3d 354, 358 n.3 (6th Cir. 2004)

(applying Michigan law).  It argues that the reference contained in the SOW was not clear and unequivocal.

In support of its position, Irwin cites *NILAC Int'l*, 362 F.3d at 358 n.3, in which the Sixth Circuit declined to incorporate a teaming agreement, where the contract incorporated a document identified only as "Attachment A," which was a handwritten description of the venture.  The court concluded that the contract mention of Attachment A did not "manifest clearly an intent to incorporate" the separate teaming agreement.  *Id.* (citing *Forge v. Smith*, 580 N.W.2d 876, 881 n.21 (Mich. 1998).

In the instant case, in contrast, the parties clearly manifested an intent to incorporate a specific document: the IBM Services Agreement, or any other document constituting an "equivalent agreement," if signed by the parties.  The SOW reference was clear and unequivocal that the IBM Services Agreement was incorporated unless a signed equivalent agreement existed.  And the reference identified a clear document against which any equivalency would be measured.

Irwin Seating argues, however, that Judge Miles' refusal to grant a motion to dismiss constitutes law of the case, barring this Court from concluding that the ICA is an equivalent agreement as a matter of law.  Judge Miles, however, held only that the copy of the ICA submitted with the Complaint, because it is unsigned, is insufficient to establish as a matter of law that the SOW incorporated the ICA as an "equivalent agreement" to the IBM Services Agreement.  Judge Miles expressly left open the question for disposition on a motion for

18

summary judgment, if supported by competent evidence.  A finding that the ICA is an equivalent agreement, therefore, is fully consistent with Judge Miles' earlier decision.

Further evidence of equivalency of the ICA to the IBM Services Agreement is found in the project change authorizations ("PCAs") related to this project.  All four PCAs modifying the SOW in issue in this case incorporate the ICA by reference.  (IBM Exs. 6-9.) As previously noted, PCA #1 constitutes the agreement under which IBM agreed to perform work associated with implementation of the SynQuest Manufacturing Manager.  That implementation included the integration of MM with Edwards' OneWorld software.  (IBM Ex. 6.)  The gravamen of Irwin's complaint is that SynQuest MM software never effectively was integrated with OneWorld and that the systems were never fully inter-operational.  As a result, the work that is the source of Irwin's principal complaints unquestionably was governed by the ICA.[1]  *Id.*

---

[1]The Court recognizes that Judge Miles, on the motion to dismiss, declined to find as a matter of law that the references to the IBM Customer Agreement in the PCAs amounted to an incorporation of the ICA.  Judge Miles concluded that the reference, without more, could be considered to be a reference to the signature page of the SOW, a portion of whose title declares it to be a "Customer Agreement."

To the extent Judge Miles' opinion is read to decide the question of the incorporation of the ICA into the PCAs, the Court must consider whether that decision constitutes the law of the case.  *See United States v. Green*, ___ F.3d ___, 2007 WL 1748698, at **5-6 (S.D. Ohio June 15, 2007) (holding that law of the case doctrine applies to earlier rulings of the district court or a coordinate court).  The law of the case doctrine prevents reconsideration of a ruling except where: (1) substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice.  *Id.* at *5 (citing *United States v. Haynes*, 468 F.3d 422, 426 (6th Cir. 2006).  The Sixth Circuit further concluded that FED. R. CIV. P. 54(b),

(continued...)

Moreover, even were the Court to accept Irwin's argument that a genuine issue of fact exists as to whether the ICA constitutes an "equivalent agreement" under the SOW, Irwin's claims against IBM would be foreclosed under the IBM Services Agreement.  Under the terms of both the ICA and the IBM Services Agreement, the parties agreed to a two-year statute of limitations period.  (IBM Ex. 2, § 1.1, IBM Ex. 5, General No. 7.)  Both the ICA and the IBM Services Agreement expressly disclaim the types of implied or express warranties upon which Irwin Seating relies for its breach of warranty counts.  (IBM Ex. 2, § 2.2; IBM Ex. 5, Warrant for IBM Services.)  Both the ICA and the IBM Services Agreement also exclude recovery for "special, incidental, or indirect damages or for any economic consequential damages (including lost profits or savings), even if they are informed of their possibility."  (IBM Ex. 5, Limitation of Liability; IBM Ex. 2, § 1.10.)

---

[1](...continued)

which provides that "any order . . . which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision at any time before the entry of judgment . . . ," also requires application of the same standard.  *Id.* at *6 (citing *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)).

Applying the standard, the Court concludes that Judge Miles' decision was limited solely to the evidence contained in the complaint and attachments, without consideration of either the ICA or the IBM Services Agreement.  The question therefore is before this Court on substantially different evidence.  Further, were the Court to construe Judge Miles' decision as final, the decision would be clearly erroneous and cause manifest injustice. The PCAs specifically reference the SOW independent of the IBM Customer Agreement, as two portions of the controlling agreements.  Suggesting that a reference to the "Customer Agreement" could be construed as a simple reference to the signature page of a document already listed is to eliminate the separate meaning of the term "IBM Customer Agreement."  Moreover, at no place on the SOW does the term "IBM Customer Agreement" appear.  The Court therefore finds that Judge Miles did not intend to foreclose reconsideration of the issue on a motion for summary judgment, as the opinion expressly states one paragraph later.  Any other reading of the decision would result in a clearly erroneous application of the facts to the law.

As a result, under either agreement, the claims raised by Irwin, which arose more than four years before the filing of the lawsuit, are time barred.  In addition, Irwin's breach of express and implied warranty claims also are foreclosed.  Further, Irwin Seating's claims for consequential damages are squarely barred by the language of the agreements.

Irwin Seating argues, however, that the mere fact that IBM offers the ICA as an equivalent agreement renders the applicability of the IBM Services Agreement a question of fact.  Irwin appears to suggest that the jury could conclude that neither agreement was incorporated.

Irwin's argument flies in the face of the SOW itself.  The plain language of the SOW states that the parties intended either the Services Agreement or another equivalent agreement to supplement the SOW.  As Judge Miles previously discussed, the IBM Services Agreement was incorporated, regardless of whether it was signed by the parties.  No basis exists for concluding that the SOW alone constituted the entire agreement between the parties.  Where, as here, both the IBM Services Agreement and the IBM Customer Agreement include identical terms under which Irwin's claims are time barred, no genuine issue of fact exists for jury consideration.

2.      Partnership by Estoppel

In an attempt to avoid the statute of limitations and to expand IBM's liability, Irwin Seating argues that IBM, Edwards and Synquest presented themselves as partners and therefore each must be held liable for the conduct of the other partners, particularly that of

Synquest.  IBM moves for summary judgment on Irwin Seating's claim of partnership by estoppel (Docket #236).

Section 16 of the Uniform Partnership Act ("UPA"), MICH. COMP. LAWS § 449.16 (2006), codifies the doctrine of partnership by estoppel in Michigan:

> When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with 1 or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person, so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

*Id.*

As this Court held on the motion to dismiss, Michigan courts have found the following statutory elements for the claim:

> In order for a partnership by estoppel to exist, (1) the defendant must have represented himself as a partner or consented to another person's representation that he is a partner of one with whom he is not partners, and (2) the person to whom the false representation is made must have detrimentally relied on that representation.

(6/22/05 Ord. at 13, docket #51.)  *See also McElwee v. Wharton*, 19 F. Supp. 2d 766, 772 (W.D. Mich. 1998); *Daratony v. Bumgardner*, No. 202562, 1998 WL 1988903, at *3 (Mich. App. Nov. 13, 1998).  As with any equitable estoppel, however, the person who claims partnership by estoppel must have been reasonable in his or her reliance on the actions of another.  *See Am. Cas. Co. v. Costello*, 435 N.W.2d 760, 762 (Mich. Ct. App. 1989) (noting

that failure to investigate or inquire into potential partners precluded estoppel by direct representation); *City of Holland v. Manish Enter.*, 436 N.W.2d 398, 401 (Mich. Ct. App. 1988) (rejecting defense of equitable estoppel because reliance was not reasonable); *see also Glazer v. Brookhouse*, 471 F. Supp. 2d 945, 948 (E.D. Wis. 2007) (applying identical Wisconsin partnership-by-estoppel provision under Uniform Partnership Act and requiring "reasonable and bona fide reliance") (quoting *Wis. Tel. Co. v. Lehmann*, 80 N.W.2d 267, 269 (Wis. 1957)); *Kitchell Corp. v. Hermansen*, 446 P.2d 934, 937 (Ariz. Ct. App. 1968) (requiring that reliance be reasonable for partnership by estoppel); *Bragg v. Johnson*, 229 A.2d 497, 498 (Del. Sup. Ct. 1966) (holding that reasonableness of reliance is essential under identical Delaware partnership-by-estoppel provision of Uniform Partnership Act); MICH. JUR. ESTOPPEL § 36 (Thomson/West 2006).

Here, Plaintiff's claim of partnership by estoppel as against IBM is barred by the express terms of both the ICA and the IBM Services Agreement, one of which unquestionably is applicable to the transaction. Both the ICA and the IBM Services Agreement expressly and unambiguously disclaim liability for the work of "IBM Business Partners":

> We have signed agreements with certain organizations (called "IBM Business Partners") to promote, market, and support some of our Products and Services. We have chosen these organizations because of their skills and experience in a particular field.

> When you order our Products or Services (marketed to you by these organizations) under this Agreement, we confirm that we are responsible for providing them to you under the warranties and other terms of this Agreement.

23

> We are not responsible for 1) the actions of these organizations, 2) any additional obligations they may have to you, or 3) any products or services that they (and not us) may supply to you.

(IBM Ex. 2, § 1.14)

> IBM has signed agreements with certain organizations (called "IBM Business Partners") to promote, market, and support certain Services.  When you order IBM Services (marketed to you by IBM Business Partners) under this Agreement, IBM confirms that it is responsible for providing the Services to you under the warranty and other terms of this Agreement.  IBM is not responsible for 1) the actions of IBM Business Partners, 2) any additional obligations they have to you, or 3) any products or services that they supply to you under their agreement.

(IBM Ex.5, IBM BUSINESS PARTNERS.)   Reliance on prior representations in the face of such incorporated provisions is unreasonable as a matter of law.  *See Hamade v. Sunoco Inc.*, 721 N.W.2d 233, 250 (Mich. Ct. App. 2006) (holding that a valid integration clause renders reliance on prior oral representations not included in the contract unreasonable as a matter of law).

Moreover, as previously noted, the SOW between IBM and Irwin contains a clear integration clause:

> Each of us agrees that the complete agreement between us about these services consists of 1) this SOW, and 2) the IBM Services Agreement (or any equivalent agreement signed by both of us).

(IBM Ex. 3.) Where a contract contains an explicit integration clause, it conclusively establishes that the parties intended the written contract to be a complete expression of their agreement.  *Wonderland*, 274 F.3d at 1095.  The integration clause nullifies all antecedent agreements and parol evidence is not admissible.  *UAW-GM Human Resource Ctr. v. KSL*

24

*Recreation Corp.*, 579 N.W.2d 411, 417 (Mich. Ct. App. 1998); MICH. COMP. LAWS § 440.2202.  By the express terms of the contract, therefore, notwithstanding any verbal representations by IBM or its partners, IBM declared its intent not to be held responsible for work supplied by its partners.

Irwin argues, however, that an integration clause does not bar the pre-contractual representations because they are not inconsistent with the terms of the writing, but instead seek to supplement the writing.  *See In re Estate of Frost*, 344 N.W.2d 331, 334 n.1 (Mich. Ct. App. 1983) (allowing parol evidence that does not contradict but merely supplements writing).  Irwin's argument is logically flawed.  Not only does the integration clause expressly limit the obligations of the parties to those contained within the contract documents, it incorporates an agreement containing an express disclaimer of liability for the conduct of partners.  In no sense can the pre-contractual representations of partnership be deemed supplementary to an express disclaimer of liability for the conduct of partners.

Irwin's related argument, that an integration clause applies only to bar evidence of pre-contractual agreements not pre-contractual statements of fact, is similarly misplaced.  In *Blumberg v. Palm*, 56 N.W.2d 412, 415-16 (Minn. 1953), cited by Plaintiff, the Minnesota Supreme Court held that the state's parole evidence rule did not bar extrinsic statements to establish partnership by estoppel, despite the existence of an integration clause.  In *Blumberg*, however, the contract in issue contained no express representations about liability for the conduct of partners, as is present in the instant case.  That distinction renders *Blumberg* completely inapposite.

25

As further evidence of the unreasonableness of Plaintiff's reliance on Defendants' statements of partnership, the Court notes that Irwin signed separate agreements with each IBM, Edwards and SynQuest, none of which contained any representation about partnership or joint liability and each of which set forth the responsibilities only of Irwin and a particular Defendant. Even without the express disclaimer of liability for the acts of partners, Irwin's reliance upon an assumption of such liability was arguably unreasonable. It is highly questionable whether a reasonable person would enter into individual contracts with a series of vendors on the assumption that each would be liable for the conduct of the other entities with their own separate contracts.

For all these reasons, the Court concludes that the contract integration clause and express disclaimer of liability bar Irwin's claim of partnership by estoppel as a matter of law. Parol evidence extending liability for the work of others as partners must be construed as contradicting the express writing and therefore barred as a matter of law. IBM therefore is entitled to summary judgment on Irwin's claim of partnership by estoppel against IBM for promises made by Synquest or Edwards.[2]

B.      J.D, Edwards' Motions

After the motion to dismiss was resolved, the only claim remaining against Edwards was breach of contract. Edwards has made three motions with respect to the contract claim.

---

[2]Having concluded that IBM is entitled to summary judgment on its first and third motions for summary judgment, the Court need not reach the arguments raised in IBM's second and fourth motions. As a consequence, those motions (Docket ##235, 237) will be denied without prejudice as moot.

1.    Partnership by estoppel

As with IBM, Irwin argues that Edwards is liable for the conduct of IBM and Synquest because the three entities held themselves out as partners and promised to provide a fully integrated system.  Irwin therefore contends that a genuine issue of fact exists that Edwards is liable for the overall failure to provide the promised integrated system.  Edwards moves for summary judgment on Irwin's partnership-by-estoppel claim (Docket #232).

As the Court previously discussed, in order for a partnership by estoppel to exist, (1) the defendant must have represented himself as a partner or consented to another person's representation that he is a partner of one with whom he is not partners, and (2) the person to whom the false representation is made must have detrimentally relied on that representation. *McElwee*, 19 F. Supp. 2d at 772.  The party claiming partnership by estoppel must have acted reasonably in relying on such representations.  *Manish Enter.*, 436 N.W.2d at 401; *Glazer*, 471 F. Supp. 2d at 948.

The Agreement signed by Edwards and Irwin contained the following language excluding Edwards' liability for the conduct of its partners:

> Customer understands that J.D. Edwards' business partners are independent entities and, except to the extent they are acting as subcontractors pursuant to Article III, Section 3(C) of this Agreement, J.D. Edwards is not liable for nor bound by any acts of such business partner.

(Edwards Ex. 14, Agreement Art. IV, Sec. 13(G).)  As previously noted, the Agreement contained a clear integration clause.

27

> This Agreement, including its terms and conditions and its Attachments and Addenda, is a complete and exclusive statement of the agreement between the parties, which supersedes all prior or concurrent proposals and understandings, whether oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

(Edwards Ex. 14, Agreement Art. V, Integration Clause.)  For the reasons previously discussed with respect to the IBM agreement, the existence of an integration clause coupled with the disclaimer of liability for the conduct of partners appears to render unreasonable any reliance by Irwin on prior representations about Edwards' liability for the conduct of its partners.

Irwin argues, however, that the disclaimer of liability under the Edwards Agreement is ambiguous, creating a question of fact as to whether Irwin reasonably relied upon representations about partnership.  Specifically, Irwin argues that, because the disclaimer expressly excludes those partners working as subcontractors, Irwin reasonably could have believed that the disclaimer was not intended to exclude partners in the Big Tiger initiative. Instead, it contends, by mentioning entities with which it subcontracts or hires who are subject to Edwards' control, Irwin could have concluded that Edwards used the word "business partners" only in reference to such subcontractors.

Irwin's argument for ambiguity is strained beyond reasonableness.  The provision expressly refers to subcontractors as a particular type of partner for which liability is *not* waived.  It was patently unreasonable for Irwin to assume that the express language of the provision disclaiming liability for the conduct of all partners *except* those over which

Edwards had control meant that the only partners to which Edwards intended to refer were those over which it had such control. The provision cannot rationally be given meaning if the only partners to which it is deemed to refer are those to whom Edwards subcontracts or otherwise controls.

As a result, the disclaimer of liability in the Edwards Agreement and the integration clause squarely and definitively bar Irwin's claims of partnership by estoppel for the conduct of Synquest.

### 2. Breach of Contract

In its second motion for summary judgment (Docket #231), Edwards contends it is entitled to summary judgment on Plaintiff's breach of contract claim. Edwards contends that Plaintiff can provide no evidence of any defect in the products as warranted under the contract.

In a series of agreements, addenda and amendments, Edwards agreed to certain warranties for all software programs and made other specific warranties and exclusions for particular software components (including Custom Works ("CW") and OneWorld ("OW")) and for service performance. Those specific applicable provisions will be discussed separately below.

In general, the Edwards Agreement granted to Irwin an express warranty for nine months after delivery that all software purchased under the agreement would "perform in all material respects" in accordance with the applicable "Published Product Specifications."

29

(Edwards Ex. 14, Contract at Art. V, ¶ 3(A)(i) & Addendum.)   The contract defines "Published Product Specifications" as "[a]ll on-line help material included within the Licensed Products and all of the user, technical, and training guides (in whatever media) associated with the licensed Products. . . ." (Edwards Ex. 14, Contract at Art. I, ¶ 15.)  The contract also disclaimed all implied warranties.  (Edwards Ex. 14, Contract at Art. V, ¶ 4(B).)[3]  It further disclaimed responsibility for

> problems in [the software] caused by alterations or modifications made by [Irwin Seating] or a third party, arising out of the malfunction of [Irwin Seating's] equipment, or caused by other software products not licensed by J.D. Edwards.

(Edwards Ex. 14, Contract at Art. V, ¶ 3(A)(iii).)  Moreover, the Agreement stated that

> J.D. EDWARDS MAKES NO WARRANTY, EXPRESSED OR IMPLIED, REGARDING ACCESSORY SOFTWARE OR ANY MODIFIED PORTIONS OF THE SOFTWARE.

(Edwards Ex. 14, Contract at Art. V, ¶ 4(B).)  Further, under the Agreement,

> J.D. EDWARDS MAKES NO WARRANTY AS TO THE ADEQUACY OR CAPACITY OF ANY HARDWARE OR THIRD PARTY SOFTWARE TO ATTAIN SOME OR ALL OF THE PERFORMANCE OBJECTIVES OF THE CUSTOMER.

(Edwards Ex. 14, Contract at Art. V, ¶ 4(C).)  Finally, as previously discussed, the agreement disclaimed liability for the acts of any business partner.  (Edwards Ex. 14, Contract at Art. V, ¶ 13(G).)

---

[3]All implied warranty claims against Edwards were previously dismissed by Judge Miles, and the sole claim in issue is the express warranty in the contract.

a.  Custom Works

Under the contract and the CW attachment to the contract, the CW program offered by Edwards was a stand-alone suite that was expressly not warranted to be interoperable with OW:

> Custom Works is a stand-alone suite and is not currently provided in a form that is interoperable with the J.D. Edwards WorldSoftware or OneWorld Software.

(Edwards Ex. 14, Contract Attachment CW.)  Six months after the initial contract, the parties executed a "Beta Test Amendment" to the contract.  In that amendment, Irwin agreed to license a beta version of the software that was not fully tested to be interoperable and was expressly sold "as is," with no warranties.  The warranty limitation declared that Irwin bore the sole responsibility for the use of that version.  In addition, the warranty of the original contract expressly disavowed implied warranties, responsibility for changes made by Irwin or others, and responsibility for the "adequacy or capacity of any hardware or third party software to attain some or all of the performance objectives of customer." (Edwards Ex. 14, Beta Test Amendment, ¶ 6.1.)

While Irwin appears to concede that it lacks any claim of defect in the beta version of CW, it argues that it has factual support for its claim of a defect in the original Custom Works software, indicating that problems existed between CW Pro and CW Quote data exchanges.  According to Irwin, sales orders did not properly print in CW.  Irwin also suggests that fields in OneWorld were unable to receive data from CW, well before the beta

version was released.  It therefore argues that Edwards breached its agreement with respect to the functionality of the original CW in the six months preceding the purchase of the beta version.

Assuming without deciding that Irwin's proofs are sufficient to demonstrate some problems existed with the original CW version, claims based on the original version of CW appear to be barred by the applicable three-year statute of limitations for Colorado claims under the UCC.[4]  All of the defects identified by Irwin based on the original version of CW were known before the beta version was licensed on December 20, 1999.  Irwin did not file a request for arbitration under the contract until August 15, 2003.  Irwin has provided absolutely no evidence that any issue under the original CW accrued within the statute of limitations.[5]  Further, Irwin's claims that fields from OW could not receive data from the

---

[4]Irwin does not dispute that the three-year statute of limitations applies to claims under the Edwards contract.

[5]The Court does not address Irwin's proffer of facts that it never implemented the beta test version of CW.  If true, Irwin would have failed to meet one of its obligations under the Beta Test Amendment, requiring it to "[i]nstall and test the Beta Software in a test environment which simulates a production environment as soon as reasonably possible after delivery of the Beta Software."  (Edwards Ex. 14, Beta Test Amendment, ¶ 3.2.)  Moreover, Irwin's signature on the Beta Test Amendment provided as follows:

> This Beta Test Amendment, including its terms and conditions and the Agreement of which it is a part, is a complete and exclusive statement of the Agreement between the parties, which supersedes all prior or concurrent proposals and understandings, whether oral or written, and all prior communications between the parties relating to its subject matter. Notwithstanding anything to the contrary in the Agreement, in the event of a conflict between this Amendment and the Agreement, this Amendment shall prevail.

(continued...)

original CW would be barred by the contract provision that expressly declared that the original CW was not warranted to be interoperable with OW.  For all these reasons, Edwards is entitled to summary judgment on Irwin's claims based on the original CW.

> b.    OneWorld

Edwards contends that Irwin fails to demonstrate a genuine issue of fact on the question of whether the OW software performed as warranted.  Edwards points to the deposition testimony of Irwin's Director of Information Technology, Bernie Stephen, who was designated as the corporate designee of Irwin under FED. R. CIV. P. 30(b)(6).  Stephen testified that he was "not aware of any issues" related to OneWorld, independent of the interface issues.  Edwards asserts that Stephen's testimony amounts to an admission that Irwin has no evidence that OW failed to work in accordance with product specifications.

Irwin replies that Stephen's testimony was hedged by a caveat, under which he stated, "with the exception of the interface issue, I am not aware of any issues *to the extent that we were able to test the software at that point in time*."  (Stephen dep. at 136, Edwards Ex. 6 (emphasis added by Irwin).)  According to Irwin, the caveat generates a question of fact about OW's performance and precludes summary judgment.

Stephen's qualification of his testimony does not create a genuine issue of fact about

---

[5](...continued)
(Edwards Ex. 14, Beta Test Amendment, Integration Clause.)  Irwin agreed in this Amendment that the prior CW agreement had been superseded.  It therefore agreed to substitute implementation of the beta version for the original CW, regardless of whether it ever did so.

whether OW performed in accordance with specifications.  Irwin must provide actual evidence of some way in which OW did not perform as warranted. *Celotex*, 477 U.S. at 322 (party opposing motion must come forward with specific facts supporting its claim); *Fogery*, 379 F.3d at 353 (prohibiting reliance on mere invocation of credibility).  The fact that Stephen cannot state with complete certainty that all performance specifications *were met* is not evidence that performance specifications *were not met.*

Irwin next recites a litany of defects in the interface with the SynQuest technology and between OneWorld and Custom Works. As the Court previously discussed, warranties for the interfaces between CW and OW and between Edwards software and Synquest were disclaimed.  Irwin suggests that the problem with the interface, however, was caused by a "defect" in the OW software.  In support of this claim, Irwin refers to an e-mail from Jack Stewart of IBM to other IBM and Edwards personnel, in which Stewart indicates that modifications to both the OW and Synquest sides of the interface would be necessary to make the interface work.  (Irwin Ex. 95.)  While the e-mail indicates that modifications to OW would be necessary to make the interface work, it does not support a conclusion that OW did not work in accordance with OW specifications, the only performance warranted by Edwards.

Irwin also refers to deposition testimony by Edwards' employee, Joe Hebner, who was assigned to support the interface between One World and Synquest.  Hebner testified that he wrote computer code to correct "bugs" in the One World software as it related to the interface

34

with Synquest. (Irwin Ex. 76, Hebner dep. at 42-44, 46.)  He further testified that a "bug" was "[s]oftware [that] wasn't doing what we thought it would do.  (Irwin Ex. 76, Hebner dep. at 42.)  While Hebner testified that some "bugs" existed in the OW software, he specifically stated that the problems he found were related to the failure of OW to "pass information ... [f]rom One World to Synquest and vice versa."  (Irwin Ex. 76, Hebner dep. at 44.)  However, the passing of information between the two systems was not warranted under the Agreement. Moreover, Hebner did not identify a single specific problem with OW.  (Irwin Ex. 76, Hebner dep. at 47.)  He also never testified that OW did not work in accordance with published specifications, the only relevant proof for purposes of summary judgment.

As a result, Irwin's complaints about defects in OW all reduce to complaints about defects in the OW-Synquest interface, a warranty not encompassed by the contract.  Irwin renews its argument that Big Tiger was sold to Irwin as an integrated system and Edwards is responsible as a partner for the failure to complete an integrated system, regardless of the express warranty.  This argument, however, is not appropriate on the breach of contract claim, where the contract itself disclaims responsibility for the actions of partners.  The claim, therefore, is viable only to the extent the partnership-by-estoppel claim is viable.  As this Court previously has concluded, the partnership-by-estoppel claim fails in light of the Agreement's integration clause and disclaimer of liability for the conduct of partners.  As a consequence, Irwin has failed to meet its burden of proof on the question of whether OW failed to work in accordance with published specifications.

35

c.      Service

The contract also warranted that consulting services would be performed in a professional and workmanlike manner. (Ex. 14, Contract at Art. V, ¶ 3(b)(i).)  Irwin suggests that a question of fact exists as to whether Edwards personnel performed consulting services in accordance with the clause.

In support of its argument, Irwin is unable to identify any specific instances of unprofessional and unworkmanlike behavior.  In the reams of pages of deposition transcripts and e-mail documentation, Irwin is able to point only to a few vague descriptions of dissatisfaction in the context of admissions that Edwards personnel were highly professional. First, Irwin argues that the testimony of Nancy Edgerle supports a finding that Mike Baldinger did not perform in a professional or workmanlike manner.  Edgerle testified as follows:

Q.      What was your opinion of Mr. Baldinger?

A.      Nice guy.  Young.  I think a go-getter.  Professional.  Treated people with respect.  In terms of a person, I guess that is how I could categorize them.  I expect that from, I guess, most people in business though.

Q.      Certainly.  do you have any criticisms of Mr. Baldinger?

A.      Yes, I would.

Q.      Okay.  And what would your criticism of him be?

A.      That he – I don't know that he always listened to really understand the needs of us, the customer, or that if we had issues, didn't feel like they were maybe elevated quick enough to get resolution or that he didn't maybe take them seriously.  That would be my criticisms.

Q.      Even with those criticisms though, you still thought highly of Mr. Baldinger?

A.     Yes.  I mean I like to give people the benefit of the doubt.

Q      You thought he was competent?

A.     Yeah.

(Irwin Ex. 20 at 47-48, docket #255.)  Irwin also references the testimony of Bernie Stephen,

Irwin's FED. R. CIV. P. 30(b)(6) deponent:

Q.     Are there any employees of J.D. Edwards that worked on the
       CustomWorks project that you believe performed in a way that was
       unprofessional.

A.     I am not aware of any.

Q.     Are you aware of any employees from J.D. Edwards who worked on the
       CustomWorks project who – whose work you criticize in any way?

A.     Yes.

Q.     Whose work would that be?

A.     Jack Lamphear and Mike Baldinger.

Q.     Those are the only two whose work on the CustomWorks project you
       criticize in any way?

A.     Yes.

Q.     Okay.  And in what way did – do you believe that Mr. Lamphear's work
       was below par?

A.     After we had signed the contract, Mr. Lamphear was brought in as and
       presented to us as the expert that knew J.D. Edwards and CustomWorks.
       And would – would assist in continuing through the implementation and
       setting up or having a lot of input to the interface, was knowledgeable
       of both JDE and CustomWorks and we looked to him to provide the
       right direction for us in moving forward with the implementation.

Q.     Okay.  And in what way do you believe his work was below par?

A.     With – it appeared to me, through conversations that I had with Nancy, that there were differences of opinions between the J.D. Edwards software folks and the CustomWorks software people, specifically Jack Lamphear.  And Jack was, as we have stated, from IB – or Jack was from J.D. Edwards, but the implementation folks for J.D. Edwards were from IBM.  So there seemed to be some differences of opinion.  And again, there just seemed to be controversy surrounding Jack.

Q.     Okay.  Other than there being differences of opinion is there anything else that leads you to believe that his work was below par?

A.     The only thing that I can remember or recall at this point in time is that he – he didn't appear to help us move through those issues as I would have expected him to with his background in both J.D. Edwards and CustomWorks.

Q.     But again, you weren't involved in the project on a day to day basis.  that was . . . Nancy Edgerle, right?

A.     That's correct.

Q.     Okay.  And did Miss Edgerle ever advise you that she believed that Mr. Lamphear was below par? . . .

A.     I don't believe so.

Q.     Did – Okay.  Did you ever come to a conclusion as to whether Mr. Lamphear was correct or the IBM consultants were correct with regard to the issues where they had differences of opinions?

A.     I don't remember the specific issues that surrounded that.  It was more of there were some discussions and appearances that there were some issues.  So I don't know the specifics.

Q.     Okay.  What leads you to believe that Mr. Baldinger's work was below par?

A.    When – when CustomWorks was initially brought to Irwin Seating in the configuration rules were being developed, there were – these rules were maintained in what I understand to be Excel spreadsheets.  I can't say specifically that it is his problem or that's the way the software was. But I had thought at that time, once I had understood that, for an enterprise-wide system, the right rules for configuration and keep those in an Excel spreadsheet was not what I had expected.

Q.    Anything else that led you to believe that Mr. Baldinger's work was below par?

A.    No.

Q.    And you can't say whether or not it was appropriate to keep the rules within Excel spreadsheets, right?

A.    I could not at that time.

Q.    And you can't at this time either, can you?

A.    I just know with the amount of rules that we had and the complexity of those rules, it became unmanageable based upon the amount and complexity of those rules that we were writing.

Q.    But again, you don't know whether that was appropriate for the way that the software was written, do you?

. . .

A.    Again, I am not a programmer and so I – I don't know.

(Irwin Ex. 19: Stephen dep. at 121-24, docket #271.)

Neither Edgerle's nor Stephen's deposition testimony is sufficient to meet Irwin's evidentiary obligation on a motion for summary judgment.  Both Edgerle and Stephen testified that Baldinger and Lamphear were competent and professional.  The fact that Edgerle believed that Baldinger did not have the same sense of immediacy as Irwin personnel about

a particular task does not create an issue of fact concerning the professionalism and competency of his performance. Stephen's testimony is even less relevant. Lamphear's disagreement with IBM personnel about unspecified recommendations proves nothing about either his competency or the workmanlike manner of his performance. In fact, Stephen could not even testify whether Lamphear or the IBM personnel ultimately were right. Further, the fact that Baldinger kept specification rules in a spreadsheet format will not support a jury finding that he did not perform in a professional or workmanlike fashion. Stephen was unable to testify as to the appropriate manner in which such data should be kept.

Nonspecific testimony about vague inadequacies does not create a genuine issue of fact regarding any particular aspect of service performance. In response to a motion for summary judgment, it was Irwin's responsibility to demonstrate the existence of a genuine and material issue for trial. *Celotex Corp.*, 477 U.S. at 323; *Street*, 886 F.2d at 1479. Edwards warranted only that services would be performed in a professional and workmanlike manner, not that, as professionals, Edwards employees might disagree with other professionals about the way in which a task should be performed or that Irwin might prefer a different system for storing documentation. Because there are no genuine issues as to any material fact in dispute, Edwards is entitled to judgment as a matter of law on this aspect of the warranty claim.

In sum, Irwin fails to demonstrate a genuine issue of material fact regarding whether its claims about CW are barred by the statute of limitations. It also fails to demonstrate an issue of fact for trial about whether OW performed in accordance with product specifications.

Further, it fails to create a genuine issue of fact regarding whether Edwards delivered its services in a professional and workmanlike manner.  As a result, Edwards' motion for summary judgment on the breach of contract claim will be granted.[6]

## IV.

For the foregoing reasons, the Court will grant Irwin's first and third (Docket ##234, 236) motions for summary judgment, and Edwards' second and third (Docket ##231, 232) motions for summary judgment.  The remaining motions for summary judgment (Docket ##230, 235, 237) will be denied without prejudice as moot.  A judgment consistent with this opinion shall be entered.


Date:   August 15, 2007            /s/ Robert Holmes Bell
                                   ROBERT HOLMES BELL
                                   CHIEF UNITED STATES DISTRICT JUDGE

---

[6]In its remaining motion for summary judgment (Docket #230), Irwin contends that the contract's limitation of liability provision bars recovery for many of the damages claimed by Irwin.  Because the Court finds that Irwin has failed to demonstrate a genuine issue of material fact on the breach of express warranty claims, the Court declines to reach the limitation of liability clause.  As a consequence, Edwards' first motion for summary judgment (Docket #230) will be denied without prejudice as moot.